707 P.2d 410

INTERMOUNTAIN HEALTH CARE, INC., a nonprofit Utah corporation doing business as Primary Children's Medical Center, Plaintiff-Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF BLAINE COUNTY, Idaho, Defendant-Respondent.

No. 15737.

Supreme Court of Idaho.

Sept. 20, 1985.

Larry Lee Goins, Idaho Falls, for plaintiff-appellant.

Phillip S. Oberrecht and Glenna M. Christensen, Boise, for amicus curiae (St. Luke's and St. Alphonsus Regional Medical Centers).

Ray Keith Roark, Hailey, for respondent.

Lloyd J. Webb, Twin Falls, for amicus curiae (Twin Falls County).

Greg H. Bower, Boise, for amicus curiae (Ada County).

HUNTLEY, Justice.

This appeal presents several significant issues related to Idaho's medical indigency statutes, Chapters 34 and 35 of Title 31 of the Idaho Code. The medical indigency statutes have required interpretation by the courts numerous times since enactment, because they contain some of the most inartfully drafted and unclear language in the Idaho Code. These statutes could well benefit from legislative redrafting, but in the interim it is the duty of the judiciary to give effect to the legislative intent of the statutes as best it can be ascertained.

The facts are these: Dan and Carla Pritchett are residents of Blaine County. On May 15, 1981, Carla Pritchett gave birth to twins at Magic Valley Memorial Hospital in Twin Falls. Because they were born prematurely and needed extensive specialty care, the twins were transferred to Primary Children's Medical Center, operated by Intermountain Health Care, Inc. ("IHC"), in Salt Lake City. The medical bills at Primary alone eventually totaled over $87,000. Another $20,000 in bills, not at issue here, were incurred at Magic Valley Memorial Hospital. The Pritchetts' health insurance carrier, Mutual of Omaha, eventually paid $32,000, leaving approximately $54,000 due Primary. In June, 1981, the Pritchetts applied to Blaine County for payment to Primary on behalf of the twins.

The Blaine County Board of Commissioners denied the application on the ground that Pritchetts were not medically indigent at the time the infants were hospitalized. IHC then requested a hearing before the Board, after which the Board again denied the application. IHC appealed to the district court. The district court affirmed the Board's denial.

IHC's appeal was first heard by the Court of Appeals, where three substantive issues were presented: first, whether IHC rather than the Pritchetts was the proper party to bring an appeal; second, whether the district court erred in holding that a hospital is required to execute on the personal and real property of the applicant before submitting a billing to the county commissioners; and third, whether Pritchetts are indeed medically indigent. A fourth issue herein is whether IHC is entitled to attorney fees on appeal.

The Court of Appeals determined that IHC was in fact the proper party to bring an appeal. It reversed the district court's holding on submission of the bill to the county, holding instead that the medical indigency statutes make the county liable for the entire bill submitted by the hospital, less any amounts, such as insurance, already *actually* received by the hospital and that the county then has the right, pursuant to I.C. § 31–3510 and § 31–3510A to seek reimbursement from the applicant and from other responsible third party sources. The Court of Appeals ruled that contrary to the findings of the Board of County Commissioners, the Pritchetts were indigent as a matter of law. As to attorney fees, the Court of Appeals held that the county was justified in defending against

the appeal, since the medical indigency statutes are unclear, and IHC was therefore not entitled to attorney fees. The Court of Appeals directed the district court to remand the matter to the Board of County Commissions with an order to grant IHC's request for payment.

The Board petitioned this Court for review of the Court of Appeals' decision, which petition we granted.

We state at the outset that we address here only cases where *emergency* medical care has been rendered to an applicant for indigency funds.[1] "Emergency care" is not defined by the medical indigency statutes, but "emergency medical services" is defined by I.C. § 39–141 (in Title 39 dealing with health and safety) as "services utilized in responding to a perceived individual need for immediate care in order to prevent loss of life or aggravation of physiological or psychological illness or injury." Clearly the Pritchett babies were in need of emergency medical services at the time they were transferred to Primary in Salt Lake City.

## I.

■ The Court of Appeals first addressed the question of whether IHC is the proper party to bring an appeal, since the Board contended, and contends before this Court as well, that because the Pritchetts were the applicants for medical assistance, only they were proper parties to perfect the appeal. We agree with the Court of Appeals's ruling that IHC was a proper party to bring this appeal. Here the initial parties, the Pritchetts, and IHC have an identity of interest. The application concerns only the bill from IHC, and in fact the Pritchetts' original application was made at IHC's behest, on a form IHC provided and assisted in filling out. IHC actually rendered the services and is the party entitled to be paid, being subrogated to the interests of the Pritchetts.

## II.

■ The second issue before us is whether the hospital must execute on an applicant's real or personal property before submitting a bill to, and receiving payment from the Board of County Commissioners. We concur with the ruling of the Court of Appeal that a hospital need not execute on an indigent's assets before submitting a bill to the county. The statutory analysis is as follows: There is an historical obligation of the county to care for its indigents. Idaho Code § 31–3509, as enacted in 1974, required a hospital to make all reasonable efforts to *collect* on an account incurred by a medically indigent person. That section was amended in 1976 to provide instead that hospitals make all reasonable efforts to *determine liability* for an account. The Court of Appeals observed that when a statute is amended it is presumed that the legislature intended the statute to have a meaning different from that accorded the statute before amendment and to create a new right or withdraw an existing one, citing *Lincoln County v. Fidelity and Deposit Co. of Maryland*, 102 Idaho 489, 632 P.2d 678 (1981); and *Leonard Construction Co. v. State Ex Rel. State Tax Commission*, 96 Idaho 893, 539 P.2d 246 (1975). The words "collect" and "determine liability" clearly have different meanings. "Collect" means to gather or assemble. With regard to money, the word implies more than the mere act of receiving the money, but also includes the implied duty to use all ordinary means for collection, such as employment of counsel and institution of suits. *See Krieger v. Title Insurance & Trust Co.*, 260 Ky. 1, 83 S.W.2d 850 (1935); *Board of Commissioners of Okfuskee County v. Hazelwood*, 79 Okl. 185, 192 P. 217 (1920). The word "determine" as defined by this Court, means "to reach a definite purpose concerning; form the intention of doing or not doing; resolve; decide; [citation omitted] to fix or settle definitely; to make specific or certain [citations omitted]. *Western Hospital As-*

---

**1.** The application process for non-emergency medical care is controlled by other portions of the indigency statute, specifically I.C. § 31–3405.

*sociation v. Industrial Accident Board of the State of Idaho*, 51 Idaho 334, 6 P.2d 845 (1931).

■ Clearly, the implication of the word "collect" is that there would be action on the part of the hospital to pursue money owed it. To "determine liability," on the other hand, would be to identify or decide or settle responsibility for payment, but not necessarily to act in obtaining the money represented by the obligation. The 1976 amendment was a conscious action by the legislature to relieve hospitals of the duty to collect on an account, and instead impose a duty to "determine liability." IHC made reasonable efforts to determine the extent of liability of other parties, such as the insurance company, and has sought to determine the extent of Pritchetts' assets. It has therefore fulfilled its statutory obligation, and may submit its bill to the county without executing on Pritchetts' assets.

■ I.C. § 31–3508 provides that a hospital bill must show total hospital charges less any amounts which have been received under any federal or state law. If any payments are received thereafter they are to be paid to the county. The county is liable to IHC for the entire bill, but has the right to seek reimbursement from the Pritchetts to the extent permitted by statute. I.C. § 31–3510, for example, provides for the county's right to subrogation to all rights of the hospital and the medically indigent person. Under § 31–3510(A), the county gains the right to reimbursement from the applicant if the applicant is able to pay any part of the charges over a reasonable period of time. The Pritchetts could for instance, be required to liquidate their interest in the Denver restaurant "over a reasonable period of time" and reimburse the county with those proceeds. Also applicable is I.C. § 31–3502(1), which provides that the county is not precluded by the definition of medical indigency from requiring medical indigents to reimburse the

county for a portion of their medical expenses.

### III.

The Board of County Commissioners argues that the issue of the hospital's responsibility for collection need not be reached here, because IHC did not meet its burden of proving Pritchetts were medically indigent. The Court of Appeals concluded that Pritchetts were medically indigent,[2] as a matter of law, noting that under the statutory definition of medical indigency, a resource must be *available* before it can be considered in determining an applicant's eligibility for assistance. To be available a resource must have a positive value greater than its liabilities, encumbrances, and indebtedness. A resource, to be available, must also be liquid; that is, it must be readily convertible into cash. *See Wheatland Co. v. Bleeker*, 175 Mont. 478, 575 P.2d 48 (1978). Pritchetts' restaurant interest, the Court of Appeals ruled, did not have a net positive value, nor was it liquid. Therefore it was not an "available" resource. As to the house and two cars, the court concluded that if those assets, valued at approximately $20,000, were liquidated, the cash would only pay a portion of IHC's bill. Even including the $20,000 the Pritchetts' resources did not appear to be sufficient to pay for necessary medical services. The Court of Appeals declared:

> I.C. § 31–3502(1) does not require that an applicant have *no* assets. It requires only that his medical expenses exceed his available resources. The applicant is either medically indigent or not—one cannot be partially indigent under the statute. Thus, the Pritchetts would appear to fall under the statutory definition of medical indigency.

■ We agree with the Court of Appeals that for a resource to be "available" and to be considered with respect to medically indigent status, it must have a net

2. I.C. § 31–3502(1) provides: " 'Medically indigent' means any person who is in need of hospitalization and who, if an adult, together with his or her spouse, or whose parents or guardian if a minor, does not have income and other resources available to him from whatever source which shall be sufficient to enable the person to pay for necessary medical services."

positive value, and it must be liquid. The question of whether a resource has a net value in excess of zero, and is liquid, is a question of fact, and was therefore for the Board of County Commissioners, and not for the appellate courts to decide.

The Pritchetts' interests at issue included a house, two cars, and a thirty percent interest in a restaurant in Denver. Dan Pritchett testified that the undepreciated value of the furniture and fixtures of the restaurant was $90,000, of which he owned thirty percent. He further testified that his thirty percent interest was of no value because the liabilities against the restaurant exceeded its present value. Mr. Pritchett also testified the restaurant had a $40,000 operating loss in 1980 and a similar loss was anticipated in 1981. In addition to testifying that the restaurant had no net value, he testified that it was not a liquid asset in any event.

We conclude there was not sufficient evidence before the Board to determine whether Pritchetts' assets, in particular the Denver restaurant, had net positive values and were liquid. The record shows that Dan Pritchett presented testimony that the restaurant's liabilities exceeded the value of its assets, and that it was not liquid. Pritchett merely testified as to his notion about the value of his share of the restaurant, but no party objected to the testimony as being conclusory or lacking in foundation. The testimony was unsupported by an appraisal of the property, or by detailed information about the profit or loss of the restaurant operation, or its encumberances and indebtedness. No other evidence was presented by any party regarding the value or liquidity of the restaurant, but the Board indicated in its determination *after* the hearing that IHC has not adequately proven the status of Pritchetts resources, and that "until they do ... we must deny the application." Clearly the Board determined that the evidence before it was insufficient to find medical indigency. The Board was not obliged to accept Pritchett's unsupported testimony that his restaurant interest was either a negative resource or non-liquid.

Nevertheless, if the Board considered the testimony regarding the net value and liquidity of the restaurant to be conclusory or insufficient for lack of foundation, it should have so ruled during the hearing, so that proper foundation could have been laid. Had the hearing been a trial with opposing counsel present, opposing counsel would have objected to admission of testimony without an adequate foundation. When the trial court sustained that objection, IHC would have been on notice that further foundation testimony was necessary. In the instant case, the Board's determination denying medical indigency status was the first indication to the applicant that it deemed the evidence with regard to Pritchetts' resources insufficient. The Board's language notwithstanding, it is obvious that IHC then had no option but to appeal, since the medical indigency hearing process was then complete. We therefore reverse and remand for taking of further evidence by the Board of County Commissioners.

IV.

IHC also requested attorney fees on appeal. Attorney fees will only be awarded, absent statute or contract, "when this Court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation." *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979); *Decker v. Home Guard Systems*, 105 Idaho 158, 666 P.2d 1169 (Ct.App.1983). The Court of Appeals ruled that the county did not defend its position frivolously, and therefore IHC was not entitled to attorney fees. We agree. Because the medical indigency statutes are confusing and difficult to interpret, the county commissioners were well justified in defending this appeal.

Reversed and remanded to district court for further remand to the Board of County Commissioners for further proceedings consistent herewith.

Costs to appellant. No attorney fees.

DONALDSON, C.J., and BISTLINE, J., concur.

BAKES, J., concurs in the result.

SHEPARD, J., dissents without opinion.